## HATMAKER v. DRY MILK CO.

Circuit Court of Appeals, Second Circuit.
July 3, 1929.

No. 330.

610

James R. Hatmaker, pro se.

Fritz von Briesen, of New York City, for appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). We quite agree with the disposition of claims 3 and 4. When the original claims were rejected, the plaintiff, with full knowledge of the circumstances, expressly disavowed any claims in which the surface temperature should be lower than 270° F. He was scarcely under a mistake at the time; he had been confronted with Just's patent, in which that had been the higher limit, and he chose to take that part of the field which Just had left open. His mistake, if any, was not in what his claims gave him—that he knew quite well—but in thinking that he was obliged to yield all Just's field to Just. Perhaps he was not; we do not say. The critical thing is that he chose at that time not to contest the question. The statute does, indeed, allow reissues broadly when "the error has arisen from inadvertence, accident, or mistake"; but this has not been extended to claims abandoned or disclaimed in the progress of the original application through the office. Eames v. Andrews, 122 U. S. 40, 7 S. Ct. 1073, 30 L. Ed. 1064, may at first blush seem to be such a case; but the discussion on pages 61 and 62 shows that nothing of the sort was intended, but rather that, had the original claim been in fact limited, the reissue would not have been upheld. In Moneyweight Scale Co. v. Toledo, etc., Co., 187 F. 826 (C. C. A. 7), it was conceded (page 830) that if a claim has once been rejected, and the rejection accepted, it may not be revived by a reissue. Such is the law. Leggett v. Avery, 101 U. S. 256, 25 L. Ed. 865; Union Metallic Cartridge Co. v. U. S. Cartridge Co., 112 U. S. 624, 644, 5 S. Ct. 475, 28 L. Ed. 828; Yale Lock Co. v. Berkshire Bank, 135 U. S. 342, 379, 10 S. Ct. 884, 34 L. Ed. 168; Dobson v. Lees, 137 U. S. 258, 263–265, 11 S. Ct. 71, 34 L. Ed. 652; Corbin Cabinet Lock Co. v. Eagle Lock Co., 150 U. S. 38, 43, 14 S. Ct. 28, 37 L. Ed. 989. In Morey v. Lockwood, 8 Wall. 230, 19 L. Ed. 339, the mistake had arisen from a misunderstanding of the physical construction of a supposed anticipation.

The original claims, which Hatmaker yielded in order to get his first allowance, were in substance the same as claims 3 and 4. Thus claim 1 was for a "surface heated sufficiently high to reduce" the milk "to a dry conservable state"; claim 2, for a "surface heated in excess of 212° F., and as much higher as may be necessary for reducing" the milk "to a dry, conservable state." Claim 3 in suit is for a "surface heated to such a temperature as substantially to expel the contained water"; claim 4, for a "surface sufficiently high to reduce" the milk "to a dry conservable state." Argument is unnecessary and the claims are invalid.

Claim 5 is not infringed, because the defendants did not "condense" any milk before drying it. That word refers back to the specifications (page 1, lines 88–96), which read: "It is not necessary that the milk should be previously condensed, although condensed milk can be dried by the process, in which case the condensing would, in a sense, form a part of the process. With condensed milk, on account of the smaller proportion of water, it will be clear that the material may be dried with a less highly heated surface." In the Just machine and in the defendants' the milk gathers in a well between two rolls closely adjacent, whence it is drawn down on their surface. It boils in the well, and is condensed somewhat while there; wherefore the plaintiff argues that claim 5 covers the

process. Of course, if this be true, the other claims were unnecessary, except for machines in which the film was formed on a single roll, and Just's claims fit as well. It is plain that nothing of the sort was intended; the claim was for a process of "first condensing" the milk "somewhat and then exposing it in a very thin film." The defendants did not use "previously condensed" milk, or "condensed milk" at all, in this process; such condensation as occurred was part of the process, and was unavoidable in a Just machine.

The most difficult question is as to the meaning and validity of claims 1 and 2. At the trial it was tacitly assumed that the phrase, "drying surface heated in excess of 270° F.," meant that the actual surface of the rolls should have that temperature while carrying the film. Upon this appeal the plaintiff argues that the meaning is not that, but that the rolls shall be heated by steam of not less than 270°. It is true that he said in the specifications (page 2, lines 36–39): "In practice I have found cylinders heated by 3¼ atmospheres of steam pressure to give excellent results." Three and a quarter atmospheres gives 278°, and we now know that the surface heat under the film at such an inside temperature will be considerably less than 270°. Hatmaker did not know this, and perhaps does not yet believe it; he may have supposed that the surface heat under the film at such pressure would be above 270°. It is uncertain whether, acting on this misunderstanding, he was speaking in his claims of effective or of inside heat, though it must be confessed that it flies straight in the face of the words to call the inside of the roll its "surface." The issue is irrelevant at any rate, because, whatever he meant, he had limited himself to what Just had not claimed, and, if Just was speaking of effective heat, that must measure Hatmaker's claims, if they are to be valid at all.

Both in his American and his British patent, Just spoke of "a surface heated to a high temperature of from 212° to 270° F.," and if this meant no more than the inside steam temperature, the plaintiff's claims would be valid, if they speak in similar terms. If, on the other hand, they speak of effective heat, then the claims must be limited to an effective heat of 270°. There can be no question that as to the lower limit Just was speaking of effective heat. The milk in the well must boil, and the water in the film must evaporate; neither of these things can happen if the steam is at 212°, because the losses are substantial. As to the lower limit, he was therefore speaking in the exact sense of his words, although perhaps, like Hatmaker, he did not know how great were the losses.

It is impossible that he meant anything different when speaking of the upper limit. We do not, indeed, know with certainty that he fixed that limit because he thought that the milk ought not to be heated higher; but there is no other apparent reason, and it is a natural inference. He can hardly have supposed that the inside heat would be about the same as the effective, because in his British patent he spoke of 40 pounds as a "good working temperature." That gives a temperature of 267°, within 3 degrees of his maximum, and, if it was a measure of effective heat also, it gave a very slight margin; a change of 2 pounds pressure would have injured the milk. Moreover, we now know, whether or not Just knew, that any such interpretation put his invention in a strait jacket. The loss in operation between inside and effective heat at 320° is nearly one-fifth, even in the scraped sector of the roll, and about one-fourth in some parts of the film; such is the evidence of the experts called by the court. An inside heat of 270° would have reduced his range to very little; indeed to almost nothing, unless the losses are proportionately less than at 320°, which is probably the case, though we do not know. Therefore, whatever Just may have supposed, it would not only have violated the language of the claims to refer "surface" to inside heat, but it would have taken the value out of the patent. Hence the claims in suit must be held to speak in terms of effective heat.

As the plaintiff has the burden of proof upon the issue of infringement, he must suffer any doubt that may arise from the evidence. Surface temperatures under such conditions are difficult to ascertain, and perhaps it is enough to say that he has not established that the effective heat used by the defendants was ever as great as 270°. For proof he relied for the most part upon the melting point of certain metals, which his experts put on the surface of the roll after it had been stopped. It took some seconds to do this and to observe the melting, and the roll, relieved of the evaporating film, quickly regains its losses. The defendants used a thermo-couple or electric thermometer, whose readings the plaintiff challenged. The experts from the Bureau of Standards, called in by the judge, tried the plaintiff's method, and found that its results were unreliable, and while they did not stop the roll, their reasons just given, for declining, seem to us good. With a thermo-couple of their own manufacture, but tested by them, they found

no temperatures higher than 259°, which was, as was to be expected, on that portion of the roll from which the film had been scraped, and where it was beginning to regain its heat. This closely corresponded with the defendants' reading on their own thermo-couple. If in actual operation no part of the cylinder, even that scraped, gets a temperature of 270°, the defendants do not infringe. It can make no difference that the surface will exceed that limit where no milk is used; the patent speaks of working conditions.

█ The refusal of the judge to allow a supplementary test, or to let the plaintiff call Professor Wilkes as to the thermo-couple used by the experts, was within his discretion. The case had been prolonged, and both sides had stipulated that at the conclusion of the test the case should be continued only for the examination of the experts and of Magill and Thwing, who were respectively to represent the parties. It was certainly permissible to read this as meaning that no other witnesses should be called. Some risk always attends such a stipulation, and cases must end, even when the parties conduct them in person.

Decree affirmed.