**FYR–FYTER COMPANY, Appellant,**
v.
**INTERNATIONAL CHEMICAL EXTINGUISHER CORP., Appellee.**

**No. 17470.**

United States Court of Appeals
Fifth Circuit.

Sept. 4, 1959.

Rehearing Denied Nov. 17, 1959.

24

Ernest P. Rogers, Atlanta, Ga., Lawrence B. Biebel, Dailey L. Bugg, Dayton, Ohio, Allen Post, Atlanta, Ga., for appellant.

Edward T. Newton, Hugh Howell, Jr., George M. Hopkins, Atlanta, Ga., for appellee.

Before RIVES, Chief Judge, and CAMERON and JONES, Circuit Judges.

RIVES, Chief Judge.

The district court held valid five of the twenty-two claims of a patent granted to Keefe, entitled "Dry Powder Fire Extinguisher Apparatus," [1] and held that

I. Patent 2,559,634, granted July 10, 1951, to two Keefes, assignors to International Chemical Extinguisher Corporation. Claims 1, 5, 6, 9 and 19, held valid, broken into their elements for clarity, are:

"Claim 1

"A dry powder fire extinguisher adapted *for discharge from the upper portion* thereof, which comprises

a container for dry powder having a concave bottom with a spherical surface,

*a discharge nozzle connected to said* container,

a discharge tube in said container having an inlet at substantially the principal focus of said spherical surface and an outlet into said nozzle, and

means for discharging a pressure gas into the upper portion of said container to cause discharge of dry powder and gas through said discharge tube and said nozzle."

"Claim 5

"A dry powder fire-extinguisher adapted for discharge from the upper portion thereof, which comprises

a container for dry powder consisting mainly of sodium bicarbonate, said container having a concave bottom with a spherical surface,

a discharge nozzle connected to said container,

an eduction pipe in said container having an inlet thereto immediately above the principal focus of said spherical surface and an outlet into said nozzle,

a container for carbon dioxide under a pressure of from about 800 to 900 pounds per square inch and

means for discharging said carbon dioxide from said carbon dioxide container into said dry powder container in a ratio of about 2½ pounds of carbon dioxide to about 100 pounds of said dry powder, thus bringing said powder and gas into the inlet of said

eduction pipe and discharging the same through said nozzle."

"Claim 6

"A dry powder fire-extinguisher adapted for discharge through the upper portion thereof in the upright position, which comprises

a container for dry powder having a concave bottom with a spherical surface,

an eduction pipe in said container having an inlet thereto at substantially the principal focus of said spherical surface and extending into the upper surface of the container and

means for discharging an inert pressure gas into said container to admix with said dry powder and to concentrate at substantially said inlet of the eduction pipe for discharge."

"Claim 9

"A method for expelling dry powder and gas under pressure from a container having

a spherical bottom surface and

a conduit axially positioned therein, which comprises passing gas under pressure toward the area of the said spherical surface and

withdrawing combined powder and gas through said conduit having an opening at substantially the principal focus of the said spherical surface and extending away from the said spherical surface."

"Claim 19

"A method of quenching fires by means of a dry powder fire-extinguisher having

a concave bottom with a spherical surface and

a confined space therein containing dry powder, which comprises

emitting an inert gas under pressure into said confined space to pass toward said spherical surface and to form a free-flowing stream of dry powder and gas converging

the appellant had infringed three of those claims.[2]

Dry powder fire extinguishers are used to extinguish fire by spreading over it finely divided particles of dry chemical, usually sodium bicarbonate. They have been known since at least as early as 1904 [3] and employ old and well-recognized principles.

The extinguisher disclosed by the Keefe patent includes a cylindrical container for holding dry powder, the concave bottom of which is spherical, with a discharge or eduction tube extending from outside the container to a point inside and near the bottom, and means for introducing gas into the upper portion of the container. The novel features of the patent mainly relied on are:

1. A concave bottom with a spherical surface; together with

2. The entrance of the eduction tube slightly above or at substantially the principal focus of the spherical surface.[4]

The concave spherical bottom had been disclosed in many earlier patents of devices for containing and expelling liquids and powders.[5] In all, or practically all, of those patents the discharge or eduction tube had extended to a point near the bottom of the container. If patentable invention exists, it must be found in the positioning of the intake end of the discharge or eduction tube.[6]

The specification describes the theory on which the invention is based as follows:

"The theory on which the invention is based in expelling powder from the powder container by means of pressure gas passing downwardly in an axial direction to the bottom of the container may be explained by reference to Fig. 4 of the drawings by analogy to the action of a concave spherical mirror. * * *

"The present invention has been developed on the theory that in the passage of a gas with dry powder entrained therein, to a concave semispherical surface, the gas and powder might come to a focus corresponding to the principal focus of a concave spherical mirror of the same curvature, provided that the passage of the gas and powder is in a direction parallel to the axis of the spherical surface or concave mirror and provided also that the powder and gas might be removed at substantially the principal focus so as not to interfere with the gas and powder traveling in the opposite direction, or, in other words, so as to prevent turbulence in the oncoming stream of gas and powder. * * * *"

█ Appellee's expert, and indeed *only* witness, Dr. Roland G. Sturm, reject-

---

at substantially the principal focus of said surface.

continuously withdrawing dry powder and gas through an eduction tube having an inlet positioned at substantially the said principal focus and

continuously expelling the said powder and gas from said eduction tube to the locus of the fire to extinguish the same."

2. Claims 1, 6 and 19.

3. See Patent No. 778,439, issued to Battelle December 27, 1904.

4. The district court said:

"Therefore in describing this patent the Court will give particular emphasis to the elements which are claimed to be

novel and critical, to-wit, the shape of the container in which there is placed the dry powder, and the approximate location of the outlet or eduction tube through which the powder is expelled to extinguish the fire. If plaintiff prevails it must be upon the basis of invention consisting of a combination of those two elements."

5. For example, see Patent 794,122 granted to Rosengarten, July 4, 1905; Patent 1,725,775 granted to Badger, August 27, 1929; Patent 2,036,698 granted to Hill, April 7, 1936; Patent 2,294,858 granted to Allen, September 1, 1942; Patent 2,420,223 granted to Brewer, May 6, 1947.

6. Of course, in a container having a concave bottom with a spherical surface.

ed that theory, and the district court also expressed its view "that the applicants were mistaken in the theory upon which they relied." We agree, however, with the district court that the theory is immaterial if the patent actually works as a new and useful device or method or improvement.[7]

Dr. Sturm insisted, for entirely different scientific reasons which he explained at length [8] and which involved "pressure pulsations" and "collapsing vortices," that the patent described much the best location for the intake end of the discharge or eduction tube. Dr. Sturm's hypothesis was sharply disputed by appellant's vice-president, Charles H. Somers, and by its expert witness, Arthur B. Guise, who had tested similar devices having transparent walls. Again, it is the actuality and not the scientific theory which counts. Had the patentee in fact discovered as the best and most effective location for the end of the tube a critical point which would not be readily determined, perhaps through trial and error, by a person having ordinary skill in the art?

The principal focus as taught by the patent is located at the distance r/2 from the bottom of the container, where r is the radius of the spherical surface of the bottom. Dr. Sturm conducted tests at that point and higher up, but made no tests to determine if expulsion was more effective or less complete with the eduction tube placed nearer the bottom of the container than r/2.[9] The appellant, on the other hand, had carefully tested its extinguisher, starting with the eduction tube in *contact* with the bottom and raising it with minute gradations through the whole range—below, at, and well above the point r/2. The appellee had known the results of the appellant's tests for more than a year before the trial, but made no effort to refute them except by the testimony of Dr. Sturm.[10]

Appellant's tests disclosed some results which might have been anticipated. When the end of the tube was in *contact* with the bottom of the container, there was room for a mere minimum of powder to enter the tube. The best results were not obtained until the tube was raised to a point where the area between the container bottom and the end of the tube at least equaled the cross-sectional inside area of the tube, so as not to block the flow of powder.[11] From that point upward, the results showed a gradual, evenly progressive drop of the percentage of discharge, with no point of criticality at r/2 or anywhere else. Extinguishers with flat bottoms, of course, have no point of focus. However, appellant's tests with flat-bottomed extinguishers produced results paralleling those obtained with round-bottom extinguishers.

It is significant that appellee's fire extinguishers were, to a large extent, manufactured in a "coffee-pot," flat-bottomed shape, rather than under the patent in suit. That conduct is hard to explain if the patent accomplished what is claimed for it. Indeed, it is inconceivable if the extravagant advance represented in the patent [12] was even approximately true.

7. Eames v. Andrews, 1887, 122 U.S. 40, 55, 56, 7 S.Ct. 1073, 30 L.Ed. 1064; Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 435, 436, 31 S.Ct. 444, 55 L. Ed. 527.

8. See record pages 94–97, 248–251.

9. Some of the claims of the patent specify the location of the lower end of the eduction tube "at substantially the principal focus" and some "immediately above the principal focus." None of the claims specify its location *below* the principal focus.

10. Dr. Sturm was a noted teacher and research engineer, but he was without experience in the dry chemical fire-extinguisher field until this case was brought to his attention. His experience was limited to about five shots of appellee's extinguishers and perhaps an equal number of shots of appellant's extinguishers.

11. In many cases that point would be substantially below r/2.

12. "* * * with this construction it was found that it was possible to discharge nearly three times as much powder with the same amount of gas as is

We are convinced that there was no new and useful device or method or improvement and no patentable invention. The judgment is therefore reversed with directions to enter judgment for the defendant, appellant here.

Reversed with directions.

possible to discharge with dry powder fire-extinguishers having the outlet nozzle at the bottom of the powder container, heretofore generally used."

When the patent was granted, the other forms of extinguisher then in use were discharging some 90% of their contents, so that, at best, this representation was a gross exaggeration.