### EMERSON CO. OF WEST VIRGINIA v. NIMOCKS.

(Circuit Court of Appeals, Fourth Circuit. February 6, 1900.)

#### No. 303.

1. PATENTS—VALIDITY OF APPLICATION.

An application for a patent for a lumber-drying kiln, introducing a new method for circulation of air in the kiln, which describes the kiln so that one could be readily constructed from the plans and specifications, is not void because it assigns a wrong rule of physics as the cause of the resulting air currents.

2. SAME—ANTICIPATION.

The Emerson patent, No. 535,982, for an improvement in lumber-drying kiln, *held* not anticipated.

3. SAME—INFRINGEMENT.

The Emerson patent, No. 535,982, for an improvement in lumber-drying kiln, *held* infringed as to claims 2, 5, and 6.

Appeal from the Circuit Court of the United States for the Eastern District of North Carolina.

Arthur Steuart, for appellant.

F. H. Busbee and Ernest Wilkinson, for appellee.

Before GOFF, Circuit Judge, and MORRIS and WADDILL, District Judges.

MORRIS, District Judge. This is a suit in equity for infringement of a patent. It was brought upon two patents, Nos. 535,981 and 535,982, but the complainant now relies only upon claims 2, 3, 5, 6, and 9 of the second patent, No. 535,982. This patent, No. 535,982, was issued March 19, 1895, upon application filed June 20, 1894, to the inventor, Victor L. Emerson, assignor to Annette E. Emerson, for an improvement in drying kilns for lumber. The inventor, in his specifications, claims that his improvement consists in the fact that in the kiln constructed by him the heated air is not cooled or discharged from the kiln chamber until it becomes fully saturated with moisture. He states that the object of the invention is to construct a simple, durable, and inexpensive kiln, which will be effective in operation, economical of heat, and wherein sufficient moisture (derived from the material being dried) will be automatically retained during the initial stage in order to keep the exposed surfaces of the material from becoming too dry, and to maintain the surfaces in the best condition until the internal moisture has been extracted. He states that in operation the heated air is first retained, and caused to circulate in a natural way through the material until it reaches a high temperature, density, and. humidity; its higher temperature increasing its capacity to absorb

99 F.—47

moisture, its greater density insuring its more equal and thorough dissemination throughout the lumber, and its humidity preventing the hardening of the exterior surfaces of the lumber before the interior parts become dry. The inventor then, with great particularity and detail, describes the construction of his kiln by which he accomplishes these results. It is a room into which two lines of cars loaded with lumber can be run, and the entrances closed. External air is allowed to enter into an air chamber in the base, and through an opening goes up and is heated by passing over steam pipes arranged beneath the cars. The heated air then ascends through the green lumber, absorbing the moisture, and losing its heat, and as it cools it becomes heavier, and descends along the sides of the chamber, and follows certain air passages until it reaches the air chamber again, where mingling with any incoming supply of outside air it is reheated and ascends again through the lumber. This process continues until all the lumber is so thoroughly heated and dried that the ascending air does not lose much heat, and the whole chamber is filled with heated air, which rises to the top space of the chamber. From this higher space the inventor provides descending ducts or air passages down which the air falls as it cools, and these ducts are open at their lower ends to the external atmosphere, and thus allows this internal air to escape. The result is claimed to be that in the first stage of the operation the heated air not escaping, but, being reheated and circulating through the lumber, the moisture is not carried off rapidly as it is when the heated air is allowed to escape by direct ventilation through the roof, and therefore for that reason the lumber is not cracked by too rapid surface drying, and also heat is economized; and in the second stage, when the lumber has been thoroughly heated, and the moisture, to a great extent, evaporated, then the air rises to the top spaces of the chamber, and as it cools is allowed to escape slowly through descending ducts, thus creating more circulation, which expedites the drying at the time when it is not hurtful to have the material dry more rapidly.

The essentials of the construction of a kiln embodying the inventor's scheme is perhaps most fully expressed in his claim 6:

"A drying kiln having in combination a drying chamber containing double tracks, so arranged as to provide vertical air-circulating passages between the loaded cars upon the tracks in the drying chamber, means in the drying chamber for supplying heat, communications from the drying chamber extending down and below the means of supplying heat, and thence opening again into the drying chamber, and descending air outlet passages having their upper parts open to receive moist air from the drying chamber, and provided with exits to the external atmosphere, substantially as shown and described.'

Taking the drawings and the specifications and this claim, it would seem that a person at all skilled in the construction of a drying kiln for lumber could construct the patented kiln, and one which would embody all the contrivances the inventor has deemed essential. It is argued by the defendant that the specifications are ungrammatically expressed, prolix, misleading, and are erroneous in their statement of the scientific principles which govern the movement of the currents of air. Nevertheless, I can see no reason why

a skilled person attempting to construct a kiln according to the specifications and the drawings of the patent should not be able to do it. It is urged against the patent that the specifications assert that the air descends in the inside passages because it has become heavy by taking up the moisture from the lumber, whereas in fact it descends because it has become cooler; and it is objected that the specifications assert that in the second stage the air is siphoned off by the outside ducts into the external air because it has become so saturated that it will not absorb any more moisture. Persons of ordinary education do not know why currents of air ascend or descend, except as they are told by scientific experts; and Emerson was no doubt wrong in the causes he assigned for the movements of the currents created in the chamber during the heating process. But if the currents are created and circulate and accomplish the drying, and are made use of beneficially at first by an internal circulation and then by a circulation which escapes to the outward air slowly through the inverted ducts in the manner and by the means which the inventor has described in his specifications, and shown in his drawings, and claimed as his improvement, it does not appear to us that it matters at all that the inventor was wrong in supposing that air saturated with moisture is heavier than dry air of the same temperature, provided it is the fact that the currents in the complainant's kiln for any scientific reason do flow as the inventor states they do, and the beneficial results are produced; and it makes no difference that he called the downward ducts siphons, and thought they acted on the principle of siphons, provided they effect the beneficial result intended by him, and in the manner he intended. The inventor states in his specifications that in ordinary kilns the highly-heated air escaped rapidly through the direct vertical outlets in the roof, and, there being a direct draft, there was a waste of heat, and a too rapid drying of the lumber; and this is consistent with common knowledge and supported by testimony. He claims that in his improved kiln the hot air, even after its preliminary circulation through the material, cannot escape by a direct outlet, but must descend through the side ducts, and only escapes slowly, and only when it has reached the openings much lower down. It makes no difference in the construction or operation of the kiln whether the fact is that the air descends and escapes slowly because it is heavy with moisture, as the inventor thought, or because it has become cooler than other air in the kiln, as the scientists instruct us. If the current moves and escapes just as the inventor provided it should, and by the means he has provided, and produces the useful result he intended, can it make any difference in the validity of the patent that he was mistaken in his explanation of the physical causes of the downward direction of the currents? The fact is clearly stated in the specifications that all the outlets from the drying chamber must be downward, and discharge into the external air below their interior connection with the chamber, so that only the air which is heavier, and tends downward, can escape; and he claims that the heat will in this way be economized, and the drying proceed in the manner most beneficial to the lumber. This is strictly true, and its resultant benefit is the

improvement claimed by the inventor. He describes the process, the mode of operation and the result, and the means for obtaining it. The scientific principle is not part of the process, is not patentable, and need not be set forth. Eames v. Andrews, 122 U. S. 40–55, 7 Sup. Ct. 1073, 30 L. Ed. 1064. The granting of the patent raises a presumption of utility which has not been overthrown.

Stress was laid in the opinion of the learned judge who heard the case below upon the fact that it had been found that the spaces LL in the drawing, being a widening of the kiln above the lumber and over the down ducts to the external air, are not necessary, and in practice are discarded. It is apparent that, while these spaces might to some extent facilitate the operation the inventor was seeking, they add considerably to the cost of construction, and in the cheaper form of kiln, shown in figure 2 of the drawings of the patent, they are omitted. They are not mentioned in any of the combinations described in the claims now sued upon. They therefore are not described as essential to the operation of the invention, and may not be worth the additional cost they entail; and it is apparent that they were not considered by the inventor indispensable, for he omits them in many of his claims and in one of his two drawings. There is no ground, therefore, to contend that the inventor introduced the spaces LL in order to mislead and deceive as to his real invention.

We have examined the prior patents cited as anticipations, and find but one which suggests the devices necessary for the first stage of interior circulation, and not one which suggests the descending outlet passages with exits to the external air. They are mostly devices for deflecting the heated air through the lumber, or means for taking up the condensed moisture, so that the partially cooled air of the kiln could be reheated and used again. The patent to Morton & Andrews—No. 426,463, dated April 29, 1890— has openings at the top of the kiln into a space between the outer and inner walls of the kiln, and, descending in that inclosed space, the air loses its moisture by condensation against the outside wall of the kiln which is of metal, and then, being partially cooled, is returned to the heating coils. This is, in substance, the first stage in complainant's method, except that complainant's kiln does not require an outside covering of metal, and the descending air is inside the inner wall of the kiln, and condenses its moisture on the ground below the heating coils. But there is nowhere suggested in Morton & Andrews' kiln the second stage of the operation of complainant's kiln, or the devices by which the process towards the end is accelerated by the increased circulation caused by a moderate outflow of the air of the kiln through the downwardly discharging ducts into the open air. With respect to the patent to H. S. Servoss,—No. 469,-067, February 16, 1892,—we think it obvious that it is only a more elaborate device for providing metallic ducts or passageways for the air from the top of the roof and the sides of the kiln down into the space beneath the heating coils to produce the same result as in the kiln of Morton & Andrews, namely, to maintain an internal circulation with devices for condensing the moisture of the heated

air. It has no suggestion of the second stage of complainant's operation by which a slowly-moving current into the open air is established. So far as we can judge from the proofs in the case, this combination found in the complainant's patent was new, and the presumption that it is useful has not been overthrown.

It remains to consider whether the defendant has infringed. The defendant's kiln was constructed by the Moore-Cain Dry-Kiln Company under patents granted to Lafayette Moore. The first is No. 524,598, dated August 14, 1894. This patent describes a tight kiln, without openings to the external air except those which admit cold air to the heating coils. It provides for spaces around the lumber for the circulation of the heated air, so that, as it cools, it falls to the bottom of the chamber, and its moisture is absorbed by the earth or sand of the bottom. Its distinctive feature is the earth or sand bottom and the absence of any flues or openings for the escape of the heated air. The advantages claimed are the rapidity of the operation, the moist condition of the whole interior, and consequent lessening of the risk of fire, and the freedom from cracks in the lumber due to the continued moisture. It is expressly stated that the final drying does not take place in the kiln, but only when the lumber is taken out and exposed in the open air. The second patent to Lafayette Moore is No. 554,134, dated February 4, 1896, upon application filed January 12, 1895. Emerson's patent now in suit was issued March 19, 1895, upon application filed June 24, 1894, so that the Emerson patent is prior by nearly a year. The Lafayette Moore second patent is stated to be an improvement on his first patented kiln, and aims to increase its capabilities by placing inclosed side flues leading from near the top of the kiln down the sides to the bottom near the places where there are openings to the external air. The devices added to the kiln of the first patent were the descending ducts or air passages and the openings to the external air, and these were precisely the two devices which Emerson had already obtained a patent for, and which distinguished his kiln from the prior tightly-closed kilns from which the heated air was not allowed to escape. The difference between the Emerson patent and the second Moore patent is to be found, not in what was done, but in the reason which Moore in his specifications has given for doing it. Emerson had said in his specifications that he introduced the downwardly discharging ducts with external openings for the purpose of carrying off the moisture-ladened air when it was no longer required, and to produce a moderately increased circulation for the final drying of the lumber while in the kiln. Moore says he introduced the descending air passages in order to conduct the air at the top of the kiln to the bottom, so that there coming in contact with the incoming air flowing in through the new external openings its moisture would be condensed, but its remaining heat be availed of, and he asserts that the movement of air through the new outside openings is all inward, and none of it goes outward. On the issue of fact as to whether, in the defendant's kiln, there is any outward movement of air from the apertures at the bottom of the descending air passages there is

conflict of testimony. The excuse for the conflict may, we think, be found in the testimony of one of the complainant's witnesses, who testifies that there were three apertures, each about two feet square, on each side of the Moore-Cain kilns, like the defendant's; that there were two currents to be observed,—one at the bottom of the aperture, flowing inward, and the other near the top, flowing out,—and that a handkerchief held fast at the top and free at its lower edge would be affected only by the lower current, and would indicate that the current was all inward. One of the defendant's witnesses testified that the reason these large apertures were cut into the sides of the defendant's kiln was because it had been found in the Moore-Cain kiln that the air which entered the ends was not uniformly distributed, so that the lumber in the middle did not dry as well as that at the ends, because it did not get a sufficient supply of air. This statement is difficult to understand, for this class of kilns are built without outlets except such accidental escapes of air as come from cheap or defective construction. There are four openings, two at each end, for the constant inflow of air to supply this accidental escape. Moore, in his specifications, states that his kiln is practically an air-tight structure, and that the heated air is to be used over again and again without appreciable loss of heat. The chamber is full of air at the commencement of the operation. These four inlets are provided. There are no outlets except accidental cracks, and it is difficult to conceive how three additional openings on each side, each two feet square, could be required to supply the accidental escape of heated air. It seems impossible that, if all that was needed in the Moore-Cain kiln was a freer and better distributed supply of air for internal circulation, some way could not be devised to supply it without making the openings at or near bottoms of the descending side air passages, thereby incurring the risks of this suit, and its great attendant costs and expenses; and it is strange that the Moore-Cain Company, which is defending this suit, should put forward the most technical defenses, and make the most strenuous efforts to exclude testimony, and to have the complainant's patent declared invalid, rather than employ some simple device for supplying the air without the risk of infringement. We cannot escape the conclusion that the descending air passages and the openings into the outside atmosphere at or near their lower ends in defendant's kiln are used, and their use persisted in, because they do produce the same beneficial results produced by the descending air ducts and openings in the complainant's patent. We agree with the learned judge below that the incorporation of the complainant is sufficiently proved, that certain answers of the expert Reid were to be excluded, and we have not regarded the testimony of the witness Ulman, taken after the refusal to allow the complainant further time in which to take testimony. Our conclusion is that claims 3 and 9 are somewhat obscure, and the question of infringement as respects them is not without doubt, but claims 2, 5, and 6 we hold are valid, and that the defendant has infringed them. The decree below is reversed as to the claims 2, 5, and 6 of patent 535,982, with directions to enter a decree find-

ing that the defendant has infringed those claims, and for an injunction and an account. The appellee is to pay the costs of this appeal.