## HATMAKER v. DRY MILK CO.

District Court, S. D. New York. January 4, 1929.

Suit for infringement of reissued letters patent No. 13,232, of May 2, 1911, granted to plaintiff for an improved process of drying milk. The claims of this patent read as follows:

"1. The hereinbefore described process of drying milk which consists in exposing it in a very thin film, for a period of time not exceeding two and one-half seconds, upon a suitable drying surface heated in excess of 270° F.

"2. The hereinbefore described process of drying milk whereby absolutely pure sterile dry milk of practically natural solubility and of natural acidity is obtained, the said process consisting in exposing natural liquid milk, in a very thin film, for a period of time not exceeding two and one-half seconds, upon a suitable drying surface heated in excess of 270° F.

"3. The hereinbefore described process of drying milk which consists in exposing unboiled chemically natural milk in a very thin film, for a period of time not exceeding two and one-half seconds, upon a suitable drying surface heated to such temperature as substantially to expel the contained water of the milk within the said period of time.

"4. The process of reducing milk or other proteid-containing liquids to a dry conservable state, which consists in exposing it, with its acid unneutralized and free from added chemical agents, in the form of a very thin film for a period of time not exceeding two and one-half seconds in duration upon a suitable drying surface heated sufficiently high to reduce it to a dry conservable state within the time of such exposure and forcing said film from said surface.

."5. The hereinbefore described process of drying milk of unneutralized acidity which consists in first condensing it somewhat and then exposing it in a very thin film for a period of time not exceeding two and one-half seconds upon a suitable drying surface heated to such temperature as will substantially dry it within said period."

The first two claims appear in Hatmaker patent No. 920,952, May 11, 1909, of which the patent in suit was a reissue. The last three claims were added upon reissue.

James Robinson Hatmaker, in pro per.

Briesen & Schrenk, of New York City (Fritz v. Briesen, of New York City, of counsel), for defendant.

THACHER, District Judge (after stating the facts as above). In a suit upon a reissued patent it is a good defense to show from the Patent Office record that there was no inadvertence, accident, or mistake in drawing the specification and claims of the original patent, for the statute (R. S. § 4916 [35 USCA § 64]) only authorizes reissue when the original is defective by inadvertence, accident, or mistake. Mahn v. Harwood, 112 U. S. 354, 5 S. Ct. 174, 28 L. Ed. 665. From the record the following appears:

Original application was filed June 29, 1906. All of the claims were rejected on reference to two patents issued to Just—No. 712,545, November 4, 1902, and No. 764,294 on July 5, 1904. In response to this action the patentee requested reconsideration, endeavoring to distinguish his process from that disclosed in the Just patents. Thereafter the Examiner held the claims too indefinite to avoid the references, and suggested amendment. The patentee then requested cancellation of all pending claims and the substitution of seven new claims. The third of these claims reads as follows: "3. The hereinbefore described process of obtaining pure dry milk solids of practically natural solubility, in light flaky form, from pure fresh liquid milk of natural acidity, which consists in exposing such milk, in a very thin uniform film, during less than two and one-half seconds of

time, upon a suitable drying surface heated to a temperature slightly higher than the temperature necessary, under any given condition of atmospheric pressure to evaporate the water contained in the said film and reduce its solids to a dry preservable state within the extremely limited time of exposure specified."

All of the new claims were rejected December 28, 1907, on the same references, but the Examiner concluded his communication as follows: " * * * To assist applicant in further prosecution, it is noted that the claims are now in good form and on request for reconsideration under Rule 69 the action on the merits will be made final, whereupon appeal may be had under Rule 133."

In the Just patent, No. 712,545, it was stated that the temperature of the drying surfaces should not exceed 270° Fahrenheit. After careful consideration of the Patent Office communication of December 28, 1907, for almost a year, the patentee advised the Patent Office of his decision to accept the rejection of his claims and to propose new ones limited to the use of temperatures in excess of 270° Fahrenheit. In his communication to the Patent Office, under date of December 12, 1908, he said:

"I have carefully considered the communication of the Examiner of December 28, 1907, and reconsidered all former objections and now wish greatly to limit my invention. I beg, therefore, that the title may be changed to Improvements in Drying Milk, and that the specification and claims may be amended, as per the enclosed copy.

"I see that my specification as originally drawn was too broad and I now limit it to the drying of milk and mixtures of milk and other substances.

"I also abandon all claim to drying in vacuo, and limit myself to the use of a drying surface heated in excess of 270° F.

"This last limitation places me clearly outside of the Just specification so far as temperature is concerned for he expressly states (lines 83 and 84 of page 2 of Patent 712,545) that the drying surface must not exceed 270° F. as a maximum.

"My use of a temperature higher than his maximum, my extremely limited exposure and the further important fact that I obtain by this new process dry milk of absolute purity and of greatly improved quality, give me, I think, a perfect right to the new claims I now present."

Four claims were proposed. Two on the process were allowed, and now appear as claims 1 and 2 of both the original and the reissue patent as quoted above. Two others on the product were rejected. In due course the original patent issued accordingly.

On August 18, 1910, fifteen months after issue of the original patent, application was made for reissue upon the ground that the patentee had inadvertently failed to claim all that he was entitled to claim under his original specification. The reissue claims 3, 4, and 5 eventuated upon this application, and their validity upon reissue is questioned. The application for reissue was examined by an Examiner not employed in the examination of the original application, and was at first denied, but later granted upon consideration of an extensive argument presented by attorneys for the patentee. This argument the patentee has since seen fit to repudiate in litigation in which he was engaged in England as a licensee under the British patent to Just. It also appears that the Examiner did not note the equivalence between claim 4, allowed on reissue, and claim 3, rejected by the Patent Office ruling of December 28, 1907, in which rejection Hatmaker acquiesced as shown by his letter of December 12, 1908, quoted above. The Examiner allowed claim 4 only because he considered that the insertion of the words "with its acid unneutralized and free from added chemical agents" distinguished it from claims rejected upon the original application. But these words mean nothing more nor less than the phrase "from pure, fresh liquid milk of natural acidity," which appear in claim 3 rejected on December 28, 1907, quoted above. Of course, the addition of the phrase "and forcing said film from said surface" cannot differentiate the two claims, because under each it was necessary to remove the film of milk from the surface within the extremely short period of two and one-half seconds. Comparison shows identity of subject-matter between the rejected claim 3 and the reissue claim 4.

What is abandoned by acceptance of a patent after acquiescence in the rejection or limitation of a claim cannot be recaptured upon reissue. Powder Co. v. Powder Works, 98 U. S. 126, 138, 25 L. Ed. 77; Leggett v. Avery, 101 U. S. 256, 25 L. Ed. 865; Dobson v. Lees, 137 U. S. 258, 11 S. Ct. 71, 34 L. Ed. 652; Corbin Lock Co. v. Eagle Lock Co., 150 U. S. 38, 43, 14 S. Ct. 28, 37 L. Ed. 989; Yale Lock Co. v. Berkshire Bank, 135 U. S. 342, 379, 10 S. Ct. 884. See Morey v. Lockwood, 8 Wall. (75 U. S.) 230, 19 L. Ed. 339, cited infra. Except under very unusual circumstances (See Morey v. Lockwood, 8 Wall. [75 U. S.] 230, 19 L. Ed. 339, cited infra) the statute (R. S. § 4916) can have no application to such a case,

because it only permits reissue when the original patent is defective "by inadvertence, accident, or mistake"—terms which do not comprehend the proposal of a claim by the patentee, its consideration and rejection by the Examiner, and acquiescence in the ruling by the patentee. Obviously the statute does not mean by "inadvertence, accident, or mistake" errors in rulings deliberately made by the Examiner and quite as deliberately accepted by the patentee. For errors in the rulings of the Patent Office the remedy is by appeal, as the patentee was advised by the Examiner in this case; not by acquiescence in the ruling, acceptance of a patent, and later application for reissue. Mahn v. Harwood, 112 U. S. 354, 359, 5 S. Ct. 174, 28 L. Ed. 665; Miller v. Brass Co., 104 U. S. 350, 26 L. Ed. 783. If the case be not within the terms of the statute, there can of course be no reissue. Accordingly, in cases where upon the record in the Patent Office it appears that new claims were allowed upon reissue without any showing of "inadvertence, accident, or mistake" such claims will be declared invalid, regardless of the time when the application for reissue was made. The absence of laches, estoppel, or intervening rights is irrelevant to a case not brought within the terms of the statute, for in such case the reissue is invalid whenever granted. Yale Lock Co. v. Berkshire Bank, supra; Coon v. Wilson, 113 U. S. 268, 277, 5 S. Ct. 537, 28 L. Ed. 963.

Plaintiff's reliance upon Morey v. Lockwood, 8 Wall. (75 U. S.) 230, 19 L. Ed. 339, cited supra, will not avail. In that case the Commissioner acted under a clear mistake of fact regarding the physical construction of a prior invention, rather inadequately described in a printed publication, and refused to allow certain claims unless limited to a specific construction. Acting under the same mistake of fact, the patentee was induced by the Commissioner to acquiesce in his ruling and to accept a patent which did not contain claims commensurate with the invention disclosed in his specification. The mistake was later discovered, and it became clear that there was nothing in the prior invention which could be said to anticipate the patentee's invention or to limit his right to claims commensurate with his disclosure. Emphasizing the special circumstances of the case, the court held that the Commissioner was not only authorized, but seemed to be under a duty, to grant the amendment because it was by his mistake that the patentee was misled. Obviously the case was one in which the failure to insist upon the claims originally presented was due to "inadvertence, accident, or mistake" within the sense of the statute. But no such state of facts is presented here, and the Supreme Court has declared that that decision is to be limited to the "special circumstances" upon which it was rendered. Russell v. Dodge, 93 U. S. 460, 463, 23 L. Ed. 973; Eames v. Andrews, 122 U. S. 40, 63, 7 S. Ct. 1073, 30 L. Ed. 1064. Plaintiff relies upon the language of Coxe, J., in Witzel v. Berman, 212 F. 734 (C. C. A. 2d) which, however, can have no significance without examination of the record, because the opinion does not disclose for what purpose or under what circumstances the reissue was granted. It is enough to say that the learned judge was thoroughly familiar with the controlling decisions of the Supreme Court in the reissue cases, as evidenced by his own opinions upon the question here presented in Arnheim v. Finstor (C. C.) 26 F. 277, and Boland v. Thompson (C. C.) 26 F. 633, where the contentions of the defendant at bar upon the question of reissue will be found to be fully sustained. The facts and the law of this case thus leave no escape from the conclusion that claim 4 was improperly allowed upon reissue, and is therefore invalid.

Claim 2 of the original states that the process consists in "exposing *natural liquid milk* in a very thin film for a period of time not exceeding two and one-half seconds, upon a suitable drying surface *heated in excess of 270° F.*" Claim 3, granted upon reissue, states that the process consists in "exposing *unboiled chemically natural milk* in a very thin film for a period of time not exceeding two and one-half seconds, upon a suitable drying surface *heated to such temperature as substantially to expel the contained water of the milk within the said period of time.*" Comparison at once discloses that the only difference between original claim 2 and reissue claim 3 is the elimination in claim 3 of the limitation to a minimum surface temperature of 270° F. The requirement that the milk treated shall be unboiled when first exposed on the drying surface does not change the meaning of the claim, because "natural liquid milk" is necessarily unboiled. Thus it appears that the allowance of claim 3 was a grant of what had been deliberately, and not by reason of inadvertence, accident, or mistake, abandoned by the patentee in the prosecution of his original application. The necessity of supporting reissue claims enlarging original claims by a showing that the failure to press the larger claims upon the original application was due to a clear bona fide

mistake, inadvertently committed, is undoubted. Huber v. Nelson Mfg. Co., 148 U. S. 270, 13 S. Ct. 603, 37 L. Ed. 447; Keller v. Adams-Campbell Co., 264 U. S. 314, 317, 44 S. Ct. 356, 68 L. Ed. 705; Topliff v. Topliff, 145 U. S. 156, 12 S. Ct. 825, 36 L. Ed. 658; Miller v. Brass Co., 104 U. S. 350, 26 L. Ed. 783. Conclusion necessarily follows that claim 3 is also invalid as an attempt to escape from a deliberately self-imposed limitation incorporated in each of the original claims in order to procure the original patent. The patentee's letter of December 12, 1908, precludes contention that there was any inadvertence, accident, or mistake in limiting the original claims to the employment of temperatures in excess of 270° F. It may be added with respect to claim 3 that, even if valid, it appears not to have been infringed. Under defendant's practice the milk is violently boiled "in the pinch"; that is, in the retaining receptacle formed by the upper adjacent portions of the two cylinders. Consequently there is no infringement, because the milk is boiled before its exposure upon the drying surface. Nor is infringement of claim 5 shown. The process described in this claim is to first condense the milk before exposing it on the drying surface. The defendant does not condense its milk. Boiling it "in the pinch" is not condensing it as understood in the art. Validity of this claim upon reissue is doubtful, but that point may be passed in view of its noninfringement.

As to claims 1 and 2, neither can be infringed unless the milk is dried upon surfaces "heated in excess of 270° F." The determination of the surface temperatures employed in defendant's machines under operative conditions is one which requires unusual technical skill and knowledge. Upon the conclusion of the testimony the question whether the temperatures employed by the defendant exceeded the minimum of 270° F. remained in serious doubt, its determination dependent upon the conflicting conclusions of experts brought in by the parties to give their testimony in support of one side or the other. Without reflection upon either of the experts who thus testified, it may be said that such testimony rarely leads to satisfactory conclusions upon questions which should be susceptible of determination with scientific accuracy. Judicial determination of scientific fact theoretically susceptible of scientific demonstration often depends, as does the solution of any disputed question of fact, upon the impression made by the witnesses upon the stand. Men of scientific training and experience should be found in agreement upon questions of pure science. But experience indicates that it is asking too much of human nature to expect even from the fairest of men unbiassed conclusions formed in the atmosphere and under the influence of a lawsuit. Brought into the controversy under employment of one side, committed in advance to certain conclusions and prepared to defend these conclusions against controversial attack, the expert witness is forced to become an advocate and is expected to maintain the conclusions which will best serve the interest of the litigant who employs him. Confronted with the necessity of extracting truth from irreconcilable conflict, the court is too often persuaded by the skill and adroitness of the witness in his advocacy of his client's cause —rarely by the unbiassed truth of his conclusions. This situation has been much discussed and is well considered by Prof. Wigmore, in his work on Evidence (section 563), where the literature on the subject is referred to.

In this case the court has been peculiarly fortunate in having a report of the Bureau of Standards of the Department of Commerce of the United States, prepared, pursuant to order entered upon consent, by two of the Bureau's Physicists, Messrs. E. F. Mueller and William F. Roeser, designated by the Director of the Bureau, Mr. George K. Burgess, and appointed by the court to measure the surface temperatures of defendant's machines and to testify as impartial experts as to such temperatures. The Bureau spent much time and money in the construction and calibration of instruments, in measuring by actual test the surface temperatures of the drying rolls used by the defendant in its plant at Bainbridge, N. Y., in the preparation of its Report, and in attendance upon the final hearing of the case. Mr. Mueller spent 13 days of his time in the work, and Mr. Roeser 23 days. All of this work was done without cost to either of the parties excepting the actual expense of travel. Thus through the cooperation of a co-ordinate branch of the government the most careful investigation by thoroughly qualified experts, uninfluenced by the slightest bias, was procured at substantially no cost to the parties. The tests were fairly conducted in the presence of experts representing the parties. The report of what was done was verified by the oaths of the government experts, who were produced and subjected to the examination of the parties. Their conclusion was: "The measurements made on the milk drying machines of the Dry Milk Co. show that the temperature of the surface of the rolls was not in excess of 270°

F. while in actual operation. The highest surface temperature observed during operation was 259° F."

The practice pursued was upon consent of the parties. Whether it might have been followed over the objection of either of them is a question which does not arise and cannot now be decided. But see in this connection Re Peterson, 253 U. S. 300, 40 S. Ct. 543, 64 L. Ed. 919, and Wigmore's discussion of the subject, at section 2484. In any event, the willingness of the Bureau of Standards to render its aid and co-operation to a court of the United States in the determination of scientific fact is significant, and suggestive of future progress in the administration of justice in the federal courts.

Upon careful consideration of the Bureau of Standards' Report, the testimony adduced by the experts called by the parties, and the examination of Messrs. Mueller and Roeser regarding the tests and their conclusions therefrom, I am constrained to find the fact to be that the surface temperatures of the defendant's machines do not exceed in operation 270° Fahrenheit, and that therefore infringement of claims 1 and 2 is not proven. Accordingly claims 1, 2, 3, and 5 are held not infringed; claims 3 and 4 are held invalid; and the complaint is dismissed, with costs.