**ELGEN MANUFACTURING CORP., a**
**New York corporation, Plaintiff,**

v.

**VENTFABRICS, INC., an Illinois corporation, Defendant.**

**No. 58 C 1191.**

United States District Court
N. D. Illinois, E. D.
May 8, 1962.

Merriam, Smith & Marshall, Chicago, Ill., for plaintiff.

Thompson, Raymond, Mayer, Jenner & Bloomstein, Chicago, Ill., for defendant.

PERRY, District Judge.

This matter having come on for trial, and the court, having observed the witnesses and considered their testimony, and having examined the exhibits introduced at the trial, and being fully advised in the premises, finds the facts and states the conclusions of law as follows:

### FINDINGS OF FACT

(1) Plaintiff is a New York corporation.

(2) Defendant is an Illinois corporation and has its place of business in Chicago, Illinois.

(3) The original Complaint herein charged Defendant with infringement of Goldsmith patent No. 2,777,573, entitled "Coiled Product", and Goldsmith patent No. 2,825,384, entitled "Method and Apparatus for Securing Metal Strips to Fabric". The first-mentioned patent was eliminated by an amendment to the Complaint on or about October 28, 1958, reinstated by an amendment to the Complaint on February 1, 1961, and finally dismissed by Stipulation filed and approved on December 19, 1961. Plaintiff has admitted that Defendant's coiled product as made since prior to the issue of U.S. patent No. 2,825,384 does not infringe said patent No. 2,777,573. Plaintiff charges that Defendant's apparatus and method infringe claims 1, 7, 8, 11, 12, 14, 15 and 19 of patent No. 2,825,384.

(4) Plaintiff is and has been the sole owner of the patent in suit. Of the claims herein involved, those numbered 7, 8, 14, 15 and 19 were held valid by this

court in civil action No. 57 C 809 entitled Elgen Manufacturing Corporation v. Grant Wilson, Incorporated (hereinafter referred to as the Grant Wilson case or Elgen v. Grant Wilson), and this court's findings and holding in that case were sustained at 285 F.2d 476 (C.A. 7, 1961).

(5) The Goldsmith patent relates to a machine and method of making a prefabricated coiled product for use as a flexible connection in heating and ventilating duct systems. Prior to the work of Goldsmith, flexible duct connectors were hand-made by sheet metal workers. To make them, two short metal strips were cut out from sheet metal stock. A short strip of fabric such as canvas or asbestos was then cut of the same length as the metal strips. One edge of each of the metal strips was separately bent in a metal-bending machine to form a U-shaped cavity. The opposite edges of the fabric were inserted into the U-shaped cavities in the respective metal strips, and were secured therein by forcibly collapsing or otherwise compressing the metal on the fabric so that the connection produced consisted of two parallel strips of metal of equal length separated by the fabric, likewise of equal length, which was joined with the metal strips at its marginal edges. In some instances, the prior practice involved the use of a "forming roll" to form the "U-shaped cavity" in the edges of the metal strips; and in the prior practice, the two metal strips were normally overlapping when the fabric was finally secured in the U-shaped cavities.

(6) In using the flexible duct connector, one of the metal strips was secured, for example, to a source of air and the other strip was secured to ductwork leading from the source. In this way, any vibration which the source of air might produce was absorbed by the fabric.

(7) Goldsmith was a sheet metal worker, and conceived the idea of prefabricating duct connectors so that one could simply cut the desired length from a coil. The sheet metal worker would then be saved the considerable amounts of time involved in the cutting, bending and forming operations involved in hand-making the connector.

(8) Goldsmith developed a machine for making coiled prefabricated flexible duct connector product in which the two metal strips overlapped each other in the coil. He obtained existing roll-forming equipment and modified it to permit the simultaneous handling of two strips of sheet metal. These modifications included the adaptation of roll-forming machinery so that fabric was attached simultaneously to one edge only of each metal strip, while the strips were being moved in parallel relationship, with the other longitudinal edge of each metal strip moving clear of the roll formers; and the combination therewith of a crimping roller driven only by the passage thereunder of material emerging from the roll formers; and the further combination therewith of a coiler which, although Goldsmith did not know it at the time, pulled the outer metal strip faster than the inner metal strip through the roll formers.

(9) Goldsmith discovered that if he produced the prefabricated material from his machine in a long flat piece and then attempted to coil the material, the product buckled and wrinkled severely, with the result that the product was unmerchantable. He discovered, however, that if the prefabricated product were drawn under tension from the forming machine onto a coiling reel, a coil could be produced which was unwrinkled and unbuckled.

(10) Goldsmith was not a trained engineer, and he did not appreciate or know the reasons for the elimination of buckling or wrinkling due to the simultaneous coiling of the material upon the reel as it was formed.

(11) In moving any strip of material in a horizontal and longitudinal plane by means of pairs of forming rolls, the forward speed of the contacting area of the rolls is necessarily different at different points of contact with the strip because except at one point, the rolls' motion also has a vertical component. Because some

contacting portions of the roll move faster than the metal strip and other contacting portions move slower than the strip, there is always slippage of the roll with respect to the strip at some part of the roll's travel, no matter how tightly such roll is pressed upon the strip.

(12) Two independent strips of metal, as alike as commercially may be, pulled in parallel relationship by two identical pairs of forming rolls mounted on a common shaft, will not feed at the same rate except by accident and then not for long.

(13) Since prior to the issuance of the Goldsmith patent, Defendant has manufactured and sold a coiled prefabricated product in which the two metal strips are in non-overlapping relationship in the coil. In manufacturing this product, Defendant uses three separate and distinct machines, to wit:

(i) A standard roll-forming machine (hereinafter called "Maplewood machine") of a type which, long prior to 1953, had been on the market, and been sold and used to simultaneously roll-form the edges of two strips of sheet metal;

(ii) "A special machine to crimp sheet metal to canvas" built for Defendant by Johnson Machine Company (hereinafter called "Johnson machine");

(iii) A coiler built by Einar H. Gustafson for Defendant.

(14) Defendant's Maplewood machine forms a U-shaped cavity (of the shape long known as an "Acme Lock") in the edges of two metal strips simultaneously. As they emerge from the Maplewood machine, the two metal strips accumulate in long lengths on, and meander across, the floor. The lengths accumulated on the floor are held in no predetermined relationship either as to path, distance apart, length or orientation in space. At any interval of time, the Maplewood machine may process one strip faster than the other and vice versa, due to irregularity of gauge or other quality of the raw material, but such non-uniformity of output is absorbed by the accumulation on the floor. The accumulation on the floor may be as much as there is space to accommodate, but in normal operation, is no less than enough (thirty or forty feet) to bend the strips about a curve, one end of which is the exit end of the Maplewood machine, and the other end of which is the entrance end of the Johnson machine. In that curve, the two metal strips cross over each other and reverse direction.

(15) In Defendant's Johnson machine, power-driven crimping rollers pull the preformed metal strips from the aforesaid accumulation on the floor past a device which "humps" the fabric strip (to contract it widthwise) and slides it sidewise into the U-shaped cavities in the metal strips, and thereafter crimp the U-shaped cavities down on the edges of the fabric.

(16) The material emerging from Defendant's Johnson machine is pushed by it through a guide which positions the metal strips in non-overlapping relationship as they approach the coiler where the material is wound into a coil with the metal strips in non-overlapping relationship.

(17) Defendant's need for a machine to do the work of the aforesaid Johnson machine was submitted to George Johnson, a skilled machinist, but without previous experience with machinery for doing the same work. Samples of metal strips having roll-formed U-shaped cavities at one edge (one of which was produced at the trial by Johnson and marked Defendant's Exhibit M) and a coiled strip of fabric were given to Johnson. In two hours' time, Johnson designed the machine and thereafter built it without any experimentation at all, except to manipulate the fabric strip in his hands to see how it would have to be guided to get its edges into the preformed U-shaped cavities in the metal strips. He designed and built it without regard to whether its output would be coiled. In so doing, Johnson merely exercised the skill of his calling, and did only what would have been obvious to a person of ordinary skill in the art prior to Goldsmith.

(18) Defendant's Johnson machine follows the teachings of the prior art

patents to Pierce 2,200,605 (fabric strip 62 fed into preformed U-shaped cavities in metal strips 76, guide rollers 86, and crimping rolls 66); Poyton 398,346 ("a hollow flexible cushion of rubber tube or other similar material" is fed into a thin strip of sheet metal beaded into the desired shape by guides e and e', and the metal strip is "clinched" about the flexible material by "clinching-rolls f f'''"); Pamer 1,580,760 (edge 12 of lining strip inserted into U-shaped cavity of preformed "hook-shaped flange 14" of sheathing metal strip, and clamped by "initial setting down roll 36", "intermediate setting down roll 38", and "final setting down roll 40"); Bosley 1,832,524 (resilient weather strip material 14 fed by guide 92 into U-shaped cavity previously formed in metal strip 15, and the assembled strips are "passed together between the rollers 71 and 72 which engage the folded metal portion and clamp it tightly about the enfolded edge of the resilient weatherstrip portion 14"); Chernack 2,539,814 (fabric strip 2 fed by guide 104 into preformed U-shaped cavity in metal strip 1 and "then pressed down by the roll 69"); Rejeski 2,592,336 (fabric strip FS is fed through guide 70 into U-shaped cavity "preformed by any suitable means" in sheet metal strip 20, and finally under pressure roll 45 which "pinches it down tightly to hold the fabric between the body of the strip and the underside of flange 22"). The provision of guides for controlling the movement of both fabric strips and metal strips was commonplace in the art long prior to 1953 as illustrated by Exhibits L and N, and the design of appropriate guides to satisfy the conditions of any specific operation was a matter of routine mechanical skill and common sense.

(19) Defendant's coiler was built by Einar H. Gustafson, a skilled sheet metal worker. Gustafson had never built a coiler before, but had seen coilers in use in various situations. He used common sense and did only what would have been obvious to a person of ordinary skill in the art prior to Goldsmith.

(20) Defendant's coiler follows long familiar and commonplace principles; and the use therein of a friction device to permit some slip of the drum relative to its drive and thereby compensate for the increase in size of the roll on the winding drum as the work goes on was commonplace in the art long prior to 1953, as illustrated by the patents to Herboldshimer 447,515, Hunt 832,974, and Jenkins 1,093,933, as well as by the publication entitled "Speed Regulating Mechanisms" and "Film-Spool Drive with Torque Motors", both published prior to 1953. That the feeding of material from a crimper to a coiler was commonplace in the art long prior to Goldsmith is abundantly illustrated by the prior art patents to Herboldshimer 447,-515, Conner 270,022, Caldwell 347,991, Rendano 1,394,116, Seiler 2,696,865 and Beckman 2,781,818. Likewise, the use of a coiler in a production line with a roll-forming machine was a not uncommon practice prior to 1953.

(21) With Defendant's accused machinery and operation, the material can be produced in a long flat piece, cut off, and coiled (as Defendant regularly coils it with the metal strips non-overlapping) either on Defendant's coiler or by hand without buckling or wrinkling, and without rendering the product unmerchantable.

(22) With Defendant's accused machinery and operation, when an attempt is made to coil the material with the metal strips overlapping (as shown by the Goldsmith patent), it does buckle and wrinkle severely with the result that the product is unmerchantable.

(23) Defendant's coiler does not pull one metal strip faster than the other. Depending upon the manual adjustment (which in turn depends upon the qualities of the metal) of the crimping rollers in Defendant's Johnson machine, the metal strips move at substantially the same speed or either one may move slightly faster than the other, but the difference cannot be attributed to the coiler. Without changing adjustment of the Johnson machine, successive lengths

—one run directly to the coiler and coiled, and the other bypassing the coiler and run out flat—were produced and measured; in each of such succcessive lengths, the metal strip on one side was shorter than the metal strip on the other side, but as between such successive, coiled and uncoiled, lengths the difference between the respective metal strips was the same.

(24) In Defendant's normal operation, the same strips of metal extend uninterruptedly through the Maplewood machine, the accumulation on the floor, the Johnson machine, and the coiler, but each machine operates in its own way to perform its own function, and there is no unexpected or surprising consequence of having them operate successively on uninterrupted metal strips. Tests were made by running two pairs of fifty-foot strips through the Maplewood machine and cutting them off; one pair of the fifty-foot strips was run through the Johnson machine assembled with fabric, crimped, and fed directly to the coiler; the other pair of fifty-foot metal strips was likewise run through the Johnson machine, but instead of being fed directly to the coiler, was run out flat, and later brought back and fed to the coiler by hand. There was no noticeable difference between the respective coiled products. In each case, the metal strip on one side was shorter than the metal strip on the other side, but the difference between the respective metal strips was the same in each case.

(25) During the prosecution of the application for the Goldsmith patent before the Patent Office, it was admitted:

"if a length of stock material of say 50 or 100 feet were prepared without special and unusual precaution and then coiled, the inner metal strip would lag behind the outer one and the fabric strip secured therebetween would become wrinkled."

The "special and unusual precaution" there referred to pertains to the production of a coil of connector duct material having overlapped metal strips, and may consist of creating a tension on one side of the flexible strip which differs to a predetermined degree from the tension on the other side of the flexible strip. Defendant exercises no such precaution; it does not produce a coil having overlapped metal strips; and it does not create a tension on one side of the flexible strip which differs to a predetermined degree from the tension on the other side of the flexible strip.

(26) Defendant's machinery and operation does not obtain, and its success does not depend upon, the unobvious result found by this Court in Civil Action No. 57 C 809, namely, that the coiler pulls one metal strip through the machine faster than the other. During the trial, Defendant offered to demonstrate to the Court the operation of its several machines, but the Court considered such demonstration unnecessary.

(27) Defendant starts with the raw materials equivalent to those contemplated by the Goldsmith patent, and produces a coiled product which is different from, albeit competitive with, that contemplated by the Goldsmith patent, but, aside from roll-forming the metal strips, feeding in fabric, crimping, and coiling, all in old and well-known ways, Defendant's machinery and procedural operations bear no substantial resemblance to Goldsmith.

(28) Defendant's arrangement of machinery and operations has none of the interdependence of partially roll-forming, insertion of fabric, completion of roll-forming, crimping and coiling embodied in Goldsmith's compactly integrated machine and method. Defendant's Maplewood machine operates in the same way to produce the same result irrespective of whether it is operating on the same or a different strip of metal from that, at the moment, being operated on (at a distant point) by the crimper or that, at the moment, being operated on (at a more distant point) by the coiler. Defendant's crimper operates in the same way to produce the same result irrespective of whether the strips are long or short; irrespective of whether the U-shaped cavities in the metal strip were

formed one at a time or two at a time, formed by forming rolls or formed by hand; and irrespective of whether the crimped product is subsequently coiled or run out flat and cut off to desired lengths. Defendant's coiler operates in the same way to accomplish the same result irrespective of whether the far end of the strip being coiled is in the crimper, in the roll-former, or free of both, and irrespective of what it is coiling. The coiler does not pull one strip faster than the other through either the roll former or the crimper. Defendant's three machines would operate in the same way to produce their several results if they were located in different buildings with no connection between them.

(29) Defendant's operation is an aggregation of old devices and old procedures which, if earlier than Goldsmith, would not have anticipated Goldsmith because Defendant avoids the problems which Goldsmith solved in his development of a unitary machine to produce an old and well-known product in the form of a coil wherein the metal strips overlapped each other.

(30) Defendant's congregation of machinery and overall operation is neither the same as, nor the equivalent of, the apparatus and method defined by claims 7, 8, 14, 15 and 19 of the Goldsmith patent which, as aforesaid, produced an unobvious result.

(31) Defendant's congregation of machinery and overall operation is such as would have been obvious to one skilled in the art, prior to Goldsmith, when called upon to do the work which defendant does.

(32) Defendant's congregation of machinery and overall operation is an aggregation of old and well-known devices functioning in old and well-known ways to produce a coiled product which differs from that of Goldsmith in such manner as to avoid whatever problems Goldsmith solved.

(33) Claim 1 of the Goldsmith patent was not in suit in Civil Action No. 57 C 809. It defines the features and elements of a machine wherein two metal strips are maintained in the same relative widthwise position from the time they enter a single compact machine until they leave it; wherein the outer edges of the metal strips are roll-formed to a vertical position at right angles to the main body of the strips, as shown in Figure 8, to form a trough; all while the interior edges of both metal strips are surrounded and engaged by a guide (shown in Figures 6, 7, 8 and 11) having two U-shaped portions which together form an S-shaped cross-section; and wherein the introduction of the fabric into said trough is integrated with the roll-forming machine which continues thereafter to bend or form those outer edges over upon the edges of the fabric as shown in Figures 9 and 10.

(34) Claim 1 of the Goldsmith patent, which was Claim 30 of the patent application, was presented after rejection and cancellation of application claims 1 and 18. Claim 1 of the patent differs essentially from said rejected and cancelled application claims 1 and 18 only in that the rejected and cancelled claims did not include the feature that the guide means have "substantially U-shaped portions surrounding and engaging the interior edges" of the two metal strips. The presentation to the Patent Office of patent claim 1 (application claim 30) was attended by the following admissions:

"Referring first to newly presented apparatus claim 30, it will be observed that claim 30 requires two juxtaposed laterally spaced apart parallelly aligned series of bending rolls and guide means having substantially U-shaped portions surrounding and engaging the interior edges of the two elongated metal strips. This presents a new structural combination which is absent from all of the prior patents which have been cited in the record of the present application.

"Referring again to claim 30, it will be observed that the guide means having substantially U-shaped portions functions to guide the metal strips longitudinally in a

predetermined widthwise relationship with respect to the series of bending rolls, with each of the series of bending rolls engaging the outer marginal portion of one of the metal strips. These metal strips are first bent to form a side of a trough and then bent over upon the remainder of the metal strip to clamp and re-engage the fabric which rests upon the metal strip."

This has reference to the metal guide 12 (S-shaped in cross-section).

(35) Defendant's machines, individually or collectively, have no counterpart of Goldsmith's guide 12.

(36) Neither Defendant's Maplewood machine nor its Johnson machine, nor the sum of the two, have all the features and elements recited in Claim 1 of the Goldsmith patent. Defendant's machines are not, individually or collectively, the same as, or the mechanical equivalent of, the Goldsmith apparatus as defined in claim 1.

(37) Claim 11 of the Goldsmith patent was not in suit in Civil Action No. 57 C 809. Claim 11 emphasizes the characterizing feature of "the interior edge portions of said metal strips being confined by guide means", while the metal strips are advanced in predetermined widthwise relationship. So confining of the inner edges of the metal strips has reference to the function and mode of operation of Goldsmith's metal guide 12 (S-shaped in cross-section), shown in Figures 6, 7, 8 and 11, which engages "only the inner edges" of both metal strips "to thereby permit the forming rolls to form the outer edge portions of the metal strips 10, 10' without interference". Except for said characterizing feature, claim 11 (which was claim 40 of Goldsmith's patent application) is substantially the same as claim 16 of the application. Said application claim 16 was rejected, cancelled, and replaced by application claim 40 (patent claim 11) with this admission:

"Claim 40 presents the invention in method form and sets forth that the two elongated metal strips are advanced in predetermined widthwise relationship with the interior edge portions of the metal strips being confined by guide means and that the outer edge portions of each of the metal strips is simultaneously formed while the inner edges of the metal strips is maintained in predetermined position."

(38) Defendant's operation involves no such confinement of the inner edges of the metal strips as that called for by claim 11 of the Goldsmith patent.

(39) Claim 12 was not in suit in Civil Action No. 57 C 809. It defines a method consisting of a longitudinal advancing procedure in which two metal strips are maintained in predetermined widthwise relation from beginning to end of a succession of steps wherein the two metal strips first advance toward and through a pressure forming operation in the midst of which, after the outer edges of the metal strips have been formed or bent upwardly at right angles to the body of the strips, and while the inner edges are maintained in predetermined position so as to form a trough (as shown in Figure 8), the fabric is placed between the vertical sides of that trough, and the pressure forming operation thereafter continues to bend or form said outer edges "over upon" the fabric (as shown in Figures 9 and 10), and then thereafter other pressure is applied to the folded over portion of the metal strips to securely attach them to the fabric. According to the patent, the forming and bending operation is accomplished by five successive sets of forming rolls (21, 21', 22, 22', 23, 23', 24, 24', 25, 25'), between the third (23, 23') and fourth (24, 24') of which the fabric is laid flat in the trough, and then the vertical sides of the trough are bent "over upon" the fabric by the fourth (24, 24') and fifth (25, 25') sets of forming rolls; and finally the secure attachment is accomplished by pushing the strips through "pressure crimping rolls indicated generally at 40"; all while the metal strips move in predetermined

straight line parallel overlapped relationship.

(40) In Defendant's procedure, the operations contrast with those defined by claim 12 of the Goldsmith patent in the following respects: Two elongated metal strips are advanced longitudinally through the standard Maplewood roll-forming machine in one widthwise relationship, and then meander along the floor, in random and uncontrolled widthwise and other relationship, where they cross over each other and their direction of movement is reversed, and thence into a crimping machine which pulls them in the opposite longitudinal direction and wherein their relationship to each other is reversed; in the Maplewood machine, the two elongated metal strips have pressure applied to "form" the inner, not the outer, marginal portions, and the outer, not the inner, edges are maintained in predetermined position so that at no time is any trough formed such as shown in Figure 8 of Goldsmith; as the two metal strips are never formed into a trough, the fabric is not placed upon any trough; when the metal strips enter the crimping machine, their edges are already fully formed, and it is necessary to hump the fabric and slide it sidewise under the already formed overhanging edges of the metal strips; the metal strips are not thereafter subjected to pressure of the kind applied by Goldsmith's forming rolls 24, 24' and 25, 25' to fold or bend their "outer extremities over upon the edge portion of the fabric 30", as shown in Figures 4, 9 and 10; and after the fabric has been inserted under the previously bent-over margins of the metal strips, the metal strips pass under pressure and crimping roll to securely attach them to the fabric.

(41) In Defendant's operation, two separate and independent Maplewood and Johnson machines, neither of which affects the operation of the other, and neither of which is affected by the operation of the other, are used at distantly spaced locations along the strips of metal whose direction of movement and relationship with each other reverse in the course of their movement. Except for convenience in handling, it is immaterial whether the formed strips of metal which come from the Maplewood machine are fed directly to the separate crimping machine or are fed to a stock pile, and then, at a later time, fed to the crimping machine for attachment to the fabric. In Defendant's operation, the metal strips are not superimposed at all in the Maplewood forming machine, but, on the contrary, they are widely separated with the edges, undergoing pressure forming, toward each other; and as they meander in a curve across the floor, their relationship with each other is uncontrolled except that each increment of a strip follows its leader to cross over (or under) the other strip and make a 180° turn before being pulled into the crimping machine. Defendant's operation is neither the same as, nor the equivalent of, the method as defined in claims 11 and 12 of the Goldsmith patent.

(42) Plaintiff charges that claim 12 of the Goldsmith patent is infringed by the operation of Defendant's crimping machine (the so-called "Johnson machine") alone, but that machine performs only the operation of inserting the fabric under the preformed overhanging edges of the metal strips, and the operation of crimping the metal on the fabric, together with the pulling of the strips into and through itself. In said Johnson machine, there is no progressive application of pressure to form the outer marginal portions of the metal strips, nor is there further progressive application of pressure, after the insertion of the fabric, to bend the outer marginal portions of the metal strips "over upon" the strip of fabric. The only pressure applied by the Johnson machine is applied to the previously (in the Maplewood machine) folded-over portion of the metal strips to crimp the metal strips to the side edges of the fabric strip.

(43) To the extent that there is community of function and mode of operation between the apparatus defined by claim 1 or the method defined by claims 11 and 12 of the Goldsmith patent (on

the one hand) the Defendant's Maplewood and Johnson machines (on the other hand), such community was old in the art as shown by the Pierce patent No. 2,200,605, wherein two metal strips 76 are progressively advanced first in curving relationship and then in parallel longitudinal relationship during which latter, at least, they are in predetermined width-wise relationship "one on each side of the fabric strip 62." Before an increment of the metal strips reaches the last-mentioned relationship, pressure is progressively applied to it "between forming rollers 82 which fold it to a U-section" while it is maintained in predetermined position by "guide rollers 80" and "guide rollers 84". When the strips reach the parallel part of their path at guide roll 86, the edges of the fabric 62 slide into the preformed folds and then pass "to the crimping rolls 66, which compress it to bind the edge of the strip 62 and form the binding 18". It was well known in the art prior to Goldsmith that with roll-forming machinery, certain accessories are required to guide the strip of metal into, through and out of a series of forming rolls, and the provision of appropriate guides for any such operation was a matter of mere mechanical skill.

(44) Goldsmith's patent application Serial No. 402,096, which later issued as Patent 2,825,384, was filed on January 4, 1954, less than a year after marketing of any commercial preformed duct material. As originally filed, Goldsmith overcame the problems involved in the prior practice by his invention, and said application clearly taught one skilled in the art how to make a coil of prefabricated duct connector material that was not characterized by buckling or wrinkling.

(45) The inventions of Goldsmith Patent 2,825,384 satisfied a long-felt want and met with instantaneous commercial success. In the year ending June 30, 1953, plaintiff's total business was less than $10,000. Despite the fact that plaintiff did not sell its metal-edged coiled connector duct product until late 1953, by June 30, 1954, plaintiff had sold over $164,000 of its coiled duct connector product. In the following seven years, it sold over $2,500,000 of the coiled material.

(46) The descriptive portion of Patent 2,825,384 contains a written description of Mr. Goldsmith's inventions, and of the manner and process of making and using them, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which they pertain, or with which they are most clearly connected, to make and use the same, and sets forth the best mode contemplated by Mr. Goldsmith of carrying out his inventions.

(47) Claims 1, 7, 8, 11, 12, 14, 15 and 19, inclusive, of Patent 2,825,384 particularly point out and distinctly claim the subject matter of Mr. Goldsmith's inventions.

(48) None of the prior art patents or publications relied upon by defendant is more pertinent to the validity of claims 1, 7, 8, 11, 12, 14, 15 and 19, inclusive, than that cited or considered by the Patent Office, or that cited by the defendant and considered by this Court in the Grant Wilson case.

(49) Claims 1, 7, 8, 11, 12, 14, 15 and 19, inclusive, of Patent 2,825,384 are directed to and define a new and patentable combination of functionally cooperating elements or steps, which combination would not have been obvious to one skilled in the art, based on knowledge of the prior art patents and publications introduced in evidence by the defendant.

(50) Morris Goldsmith is the original, sole and first inventor of the inventions of claims 1, 7, 8, 11, 12, 14, 15 and 19, inclusive, of Patent 2,825,384. The inventions of these claims were not known or used by others in this country before the invention thereof by Morris Goldsmith, were not patented, or described in this country or any foreign country before the invention thereof by Morris Goldsmith or for more than one year before the presentation of the invention of said claims to the Patent Office in the form of a patent application, and were not in public use or sale before the in-

vention thereof by Morris Goldsmith or for more than one year before the presentation of the invention of said claims to the Patent Office as a patent application.

(51) The testimony of Mr. Gustafson and Mr. Johnson, both of whom were Defendant's witnesses, showed that defendant's methods and/or apparatus for making coiled duct connector products (comprising fabric having a strip of metal secured to each of its side edges) have not been and are not now trade secrets, and no credible evidence was presented at the trial that would support a different finding.

(52) Any finding of fact entered herein which may properly be construed in whole or in part as a conclusion of law shall be so deemed and treated as if set forth under Conclusions of Law herein.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction of the parties and of the subject matter of this suit. Venue was properly laid in this District.

(2) Plaintiff is the owner of United States Letters Patent 2,825,384, issued March 4, 1958, and has been since its date of issuance.

■ (3) Claims 1, 7, 8, 11, 12, 14, 15 and 19 of United States Letters Patent 2,825,384, and each of them, are good and valid in law but are not infringed by defendant.

■ (4) A patent is presumed to be valid upon issuance by the United States Patent Office, and such presumption of validity can be overcome only by clear and cogent proof, and the burden of overcoming this presumption rests upon the defendant. 35 U.S.C. § 282; Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937); Helms Products v. Lake Shore Manufacturing Co., 227 F.2d 677, 680 (C.A.7, 1955); Copease Manufacturing Co., Inc. v. American Photocopy Equipment Co., (C. A.7), 298 F.2d 772.

■ (5) The presumption of validity is entitled to greater weight when the principal art relied upon by the defendant has been considered and rejected by the Patent Office or by this Court in another suit involving the same patent. Elgen v. Grant Wilson, supra; Hunt v. Armour & Co., 185 F.2d 722, 726 (C.A.7, 1950); Lewyt Corporation v. Health-Mor, Inc., 181 F.2d 855, 857 (C.A.7, 1950).

■ (6) The failure by those working in the field to accomplish the results obtained by patentee is good evidence that patentee's contribution constitutes patentable invention. Elgen v. Grant Wilson, supra; Pyle National Co. v. Lewin, 92 F.2d 628, 630 (C.A.7, 1937).

■ (7) The commercial success of the subject matter of Patent 2,825,384 adds strength to its validity. The validity of claims 1, 7, 8, 11, 12, 14, 15 and 19 of Patent 2,825,384 is, however, clear and the Court has not found it necessary to rely upon such commercial success in finding these claims valid. Elgen v. Grant Wilson, supra.

(8) Commercial recognition of the subject matter of a patent is further evidence of the presence of invention. The validity of claims 1, 7, 8, 11, 12, 14, 15 and 19 of Patent 2,825,384 is, however, clear and the Court has not found it necessary to rely on such commercial recognition in finding these claims valid. Elgen v. Grant Wilson, supra; Copeman Laboratories Co. v. General Plastics Corp., 149 F.2d 962 (C.A.7, 1945); Ray-O-Vac Co. v. Goodyear Tire & Rubber Co., 136 F.2d 159 (C.A.7, 1943), aff'd 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721 (1944).

■ (9) A patented combination cannot be anticipated piecemeal by finding individual features separately in the prior art. Elgen v. Grant Wilson, supra; Imhaeuser v. Buerk, 101 U.S. 647, 660, 25 L.Ed. 945 (1880); Bates v. Coe, 98 U.S. 31, 48, 25 L.Ed. 68 (1878).

■ (10) It is not sufficient to constitute an anticipation that a device of the prior art might, by modification, be made to accomplish the function performed by the patent in question, if it were

not designed, nor adopted, nor actually used, for the performance of such functions. Topliff v. Topliff, 145 U.S. 156, 161, 12 S.Ct. 825, 36 L.Ed. 658 (1892); Copease Manufacturing Co., Inc. v. American photocopy Equipment Co., 298 F.2d 772 (C.A.7, 1961); Young Radiator Co. v. Modine Mfg. Co., 55 F.2d 545, 547 (C.A.7, 1931).

■ (11) "Hindsight" is not a proper basis for determining patentability. While a particular solution to a problem may seem simple in retrospect, after its disclosure, foresight applied as of the date of the invention is the only proper test of invention. Elgen v. Grant Wilson, supra; Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527 (1911); Ray-O-Vac Co. v. Goodyear Tire & Rubber Co., 136 F.2d 159 (C.A.7, 1943), aff'd 321 U.S. 275, 64 S. Ct. 593, 88 L.Ed. 721 (1944).

■ (12) It is reasonable to conclude that the Patent Office Examiner considered and discarded all patents officially classified, including official cross-references, in the Class and Subclass in which Patent 2,825,384 is officially classified. Elgen v. Grant Wilson, supra; Copease Manufacturing Co., Inc. v. American Photocopy Equipment Co., 298 F.2d 772 (C.A.7, 1961); Artmoore Co. v. Dayless Mfg. Co., 208 F.2d 1, 4 (C.A.7, 1953).

(13) None of the prior art cited by the defendant, taken singly or in combination, in any way negatives the validity or scope of claims 1, 7, 8, 11, 12, 14, 15 and 19, inclusive, of Patent 2,825,384. None of the references relied upon by defendant is more pertinent to the validity of these claims than the references cited by the Patent Office experts, and these experts considered these claims clearly patentable by the issuance of said patent. None of the references relied upon by defendant is more pertinent to the validity of these claims than the references cited or relied upon by the defendant, Grant Wilson Incorporated, in Elgen v. Grant Wilson, supra.

(14) The invention defined by claims 1, 7, 8, 11, 12, 14, 15 and 19, inclusive, of Patent 2,825,384 was not obvious to those skilled in the art at the time said invention was made.

■ (15) The fact that the patentee at the time of the filing of his application, that later issued as Patent 2,825,384, was unaware of the scientific principle involved in the formation of his unwrinkled and undistorted coiled duct connector product is immaterial. Elgen v. Grant Wilson, supra; Eames v. Andrews, 122 U.S. 40, 55, 56, 7 S.Ct. 1073, 30 L.Ed. 1064 (1887); Westmoreland Specialty Co. v. Hogan, 167 F. 327 (C.A.3, 1909); Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220 U.S. 428, 435, 436, 31 S.Ct. 444, 55 L.Ed. 527 (1911).

■ (16) A new combination of old elements whereby an old result is obtained in a more facile, economical and efficient way, or whereby a new and useful result is secured, may be protected by a patent. Elgen v. Grant Wilson, supra; Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 443, 31 S.Ct. 444, 55 L.Ed. 527 (1911); Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177 (1882).

■ (17) Claims of a patent are not invalid for aggregation where the elements coact to produce a new result exceeding the sum of the functions of the elements alone, whether the elements act simultaneously or successively. Holstensson v. Webcor, Inc., 150 F.Supp. 441, 447 (D.C., N.D.Ill., 1957); Grinnell Washing Mach. Co. v. E. E. Johnson Co., 247 U.S. 426, 432, 38 S.Ct. 547, 62 L.Ed. 1196 (1918); Blaw-Knox Company v. I. D. Lain Company, 230 F.2d 373 (C.A. 7, 1956); Krell Auto Grand Piano Co. of America v. Story & Clark Co., 207 F. 946, 951–954 (C.A.7, 1913).

(18) Claims 1, 7, 8, 11, 12, 14, 15 and 19 of Patent 2,825,384 are not for an old or exhausted combination or a mere aggregation, but each of these claims patentably defines a patentable combination.

(19) A patent is not limited to the particular embodiment of the invention shown and described in the specification, since the claims of the patent measure the invention. Holstensson v. Webcor, Inc., 150 F.Supp. 441 (D.C., N. D.Ill.1957); Eversharp, Inc. et al. v. Fisher Pen Co., Inc. et al., (D.C., N.D., Ill., 1961), 204 F.Supp. 649; Smith v. Snow, 294 U.S. 1, 16, 55 S.Ct. 279, 79 L. Ed. 721 (1935); Gray Telephone Pay Station Co. v. Baird Mfg. Co., 174 F. 417, 422, 423 (C.A.7, 1909).

(20) The plaintiff has not been and is not now using Patent 2,825,384 in an attempt to create an unlawful monopoly.

(21) The plaintiff has not been and is not now competing unfairly with the defendant in connection with defendant's use of methods and/or apparatus covered by Patent 2,825,384.

(22) The plaintiff is not guilty of unclean hands and/or misuse of Patent 2,-825,384.

(23) The prior art was open to defendant. Ronning Machinery Company v. Caterpillar Tractor Co., 129 F. 2d 70, 73 (C.A.7). When defendant followed the prior art with nothing included in its machinery or operation other than the application of such art plus ordinary mechanical skill, then, even though validity of the patent be conceded, the mere fact that the accused machinery or method may, in a sense, read upon the claims of the patent, does not spell infringement. Dixie-Vortex Co. v. Paper Container Mfg. Co., 130 F.2d 569, 577 (C.A.7). Where a device or method is so far changed in principle from a patented thing that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement. Linde Air Products Co. v. Graver Tank & Mfg. Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097; Simmons Company v. A. Brandwein & Co., 250 F.2d 440, 450 (C.A.7). Mere application of claim phraseology is not alone enough to establish infringe-ment. To establish infringement, there must be real identity of means, operation and result. Scherbatskoy v. U. S. Steel Corporation, 287 F.2d 552, 558 (C.A.7).

(24) The complaint herein and all amendments thereto should be dismissed; the counterclaims of defendant should be dismissed, the defendant to go hence without day; and each party hereto should bear its own costs and attorney's fees in this matter.

(25) Any conclusion of law entered herein which may be construed in whole or in part as a finding of fact shall be so deemed and treated as if set forth under Findings of Fact herein.